2006 OK CIV APP 45

**MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.,** Plaintiff/Appellee,

v.

**UNITED STATES of America, ex rel., INTERNAL REVENUE SERVICE,** Defendant/Appellant,

and

**Mark S. Douglas and Rhonda K. Douglas, Husband and Wife; Occupants of the Premises; Armstrong Developments, L.L.C.; State of Oklahoma, ex rel., Oklahoma Employment Security Commission; State of Oklahoma ex rel., Oklahoma Tax Commission; Oak Tree Homeowners Association, Inc.,** Defendants.

No. 102,694.

Court of Civil Appeals of Oklahoma, Division No. 1.

Feb. 16, 2006.

---

Blake C. Parrott, Baer, Timberlake, Coulson & Cates, P.C., Oklahoma City, OK, and Rick Vernon, D. Jay Steen, Kivell, Rayment and Francis, Tulsa, OK, for Plaintiff/Appellee.

John C. Richter, United States Attorney, K. Lynn Anderson, Assistant United States Attorney, Oklahoma City, OK, for Defendant/Appellant, United States of America, ex rel. Internal Revenue Service.

Opinion by CAROL M. HANSEN, Judge.

¶1 Appellant Internal Revenue Service ("IRS") appeals a final order of the trial court granting summary judgment to Appellee Mortgage Electronic Registration Systems, Inc. ("MERS") on the issue of lien priority under the doctrine of equitable subrogation.[1]

¶2 In 2001, Borrowers,[2] purchased fee simple record title to their home, financing their purchase with two mortgage loans, both recorded in 2001, in favor of Saxon Mortgage, Inc. and Venture Real Estate, Inc. ("the 2001 mortgage").

¶3 IRS recorded tax liens against Borrowers for $144,256.02 in Oklahoma County on May 22, 2002.

¶4 In "late 2002," Borrowers decided to refinance their 2001 mortgage and applied for a loan with Meritage Mortgage Corp., MERS's predecessor in interest.[3] Borrow-

---

1. The appeal is submitted without appellate briefing in accordance with the accelerated procedure under Rule 1.36, Oklahoma Supreme Court Rules, 12 O.S.2001, Ch. 15, App.

2. Borrowers are Mark S. Douglas and Rhonda K. Douglas. Borrowers were mortgagors and residents of the real estate at issue at all times for purposes of this case. Borrowers are not parties to the present appeal.

3. Hereinafter, Meritage and MERS will be referred to collectively as "Lender."

ers apparently omitted to disclose the existence of the IRS liens and claimed they could grant Lender a first mortgage upon payment and release of the 2001 mortgage and all other liens and encumbrances of which Lender had actual knowledge.

¶ 5 According to the affidavit of a third party in the financing industry, Lender ordered an initial title opinion respecting Borrowers' property, and this opinion did not reflect the IRS liens. Additionally, Lender allegedly generated a credit report in connection with Borrowers' application; however, Borrowers did not sign the release for the credit report in their loan application until January 15, 2003, the same day they delivered the promissory note. Lender also relies upon a May 5, 2004 interim title report, prepared by a different title company, covering October 2002, through March 2003. The document does not disclose the existence of IRS's liens. It is post-dated and appears as a summary and without the documents to which it refers. Lender asserts it would have denied Borrowers their requested loan had its efforts revealed the IRS liens, and that it did not have actual knowledge of the IRS liens until it performed a new title search in August 2003, in preparation for this litigation.

¶ 6 IRS argues Lender failed to show what actions were taken by the title companies, whether a current abstract was obtained, and if so, what the abstract reflected. IRS admits neither title company's documents lists the IRS liens, but maintains Lender failed to exercise due diligence when examining for pre-existing liens.

¶ 7 On January 15, 2003, Borrowers delivered a promissory note to Lender in which they agreed to pay off the loan of $350,000.00 at an interest rate of 9.99%. On the same date, Borrowers executed and delivered a real estate purchase money mortgage, as part and parcel of the note transaction, encumbering their real estate to secure payment of the note. A January 15, 2003 settlement statement between Borrowers and Lender evidences that over 90% of the loan

was used to pay off the 2001 mortgage, leaving Borrowers with about $15,500 cash. Lender's mortgage was filed and recorded on January 27, 2003. Borrowers defaulted on May 1, 2003.

¶ 8 Lender filed its petition to foreclose and establish lien priority, naming Borrowers and five other parties as Defendants with potential claims against the real estate. IRS answered, asserting its right to lien priority by virtue of the fact its claim was recorded prior to Lender's mortgage.

¶ 9 IRS moved for summary judgment on grounds its tax lien was recorded prior to Lender's mortgage and that Lender was not entitled to subrogation under the rules in *Southwest Title*[4] and *Citizens State Bank*.[5] Lender responded and cross-moved for partial summary judgment on grounds it was entitled to equitable subrogation to the 2001 mortgages. The trial court applied the common law doctrine of equitable subrogation to Lender's mortgage, subrogating Lender to the priority status of the 2001 mortgagee, and issued a final order granting Lender lien priority over the IRS and all other liens. IRS appealed the trial court's order.

¶ 10 "Summary judgment is appropriate only where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law." *Wathor v. Mut. Assurance Adm'rs, Inc.*, 2004 OK 2, 87 P.3d 559, 561. When this Court reviews the trial court's grant of summary judgment, all inferences and conclusions drawn from the evidence must be viewed in the light most favorable to the party opposing the motion. *Shelley v. Kiwash Elec. Coop., Inc.*, 1996 OK 44, 914 P.2d 669, 674. "The court may not weigh the evidence." *Flanders v. Crane Co.*, 1984 OK 88, 693 P.2d 602, 605. "[O]ur standard of review of a trial court's grant of summary judgment is de novo." *Wathor, supra.*

¶ 11 IRS argues it is entitled to first priority of its tax liens because Lender failed to establish it was entitled to equitable subrogation under *Southwest Title & Trust Co. v. Norman Lumber Co.*, 1968 OK 71, 441 P.2d

---

4.  *Southwest Title & Trust Co. v. Norman Lumber Co.*, 1968 OK 71, 441 P.2d 430

5.  *Citizens State Bank of Tulsa v. Pittsburg County Broad. Co.*, 1954 OK 51, 271 P.2d 725.

430, and *Citizens State Bank of Tulsa v. Pittsburg County Broad. Co.*, 1954 OK 51, 271 P.2d 725. IRS also argues the trial court misapplied the doctrine of equitable subrogation because the amount loaned by Lender exceeded payoff of the earlier mortgage.

¶ 12 In *Southwest Title*, the builder procured a loan from the bank, secured by a mortgage on the property. The builder entered into contracts with materialmen for construction materials, but it defaulted, and those companies filed materialmen's liens on the property. The builder then sold the home to the purchaser. The purchaser obtained a loan from a lender, secured by a new mortgage on the property in the purchaser's name, as new record owner. The purchaser paid off the builder's mortgage to the bank and pocketed about five-thousand dollars of the loan. The lender recorded its lien in June 1965.

¶ 13 The purchaser defaulted and the lender's assignee filed an action to foreclose. Materialmen sought priority of their intervening liens. The trial court found for materialmen.

¶ 14 On appeal, the lender's assignee argued the trial court erred by not subrogating it to the superior priority status of the bank, the builder's mortgagee. Materialmen argued the bank loaned money to the purchaser "voluntarily," when it had neither an interest in the land nor an agreement to make or pay off a loan on the property.

¶ 15 In finding against the lender's assignee, the Supreme Court noted:

> [o]ne who, having no interest to protect, voluntarily loans money to mortgagor for the purpose of satisfying and canceling a prior mortgage, taking a new mortgage for his own security, cannot have the former mortgage revived and himself subrogated to the rights of the mortgagee thereon when he has failed to take an assignment [6] of the prior mortgage, and has voluntarily paid and discharged the same record.

**6.** As to any contention that *Southwest Title* stands for the proposition that Lender is required to take an assignment in order to avoid being labeled a "volunteer" lender, see *King v. Towe*, 2000 OK CIV APP 1, 996 P.2d 948, 950 ("Legal

*Id.* at 433 (citing *Citizens State Bank of Tulsa v. Pittsburg County Broad. Co.*, 1954 OK 51, 271 P.2d 725).

¶ 16 The Supreme Court reasoned equitable subrogation will only be invoked where it is clearly implied, from all the facts and circumstances surrounding the transaction, it was the intention of the parties that lender have a mortgage of equal dignity and position with the prior mortgagee upon discharge of that debt. *Id.* at 434. In denying the assignee the right to subrogate, the Supreme Court emphasized a lack of evidence establishing that the purchaser requested the loan to pay off the mortgage indebtedness of the builders. *Id.* The Supreme Court gave no weight to the fact that the purchaser's loan exceeded the amount of the builder's original mortgage.

¶ 17 On the other hand, "[w]here money is advanced on [a] defective security for the purpose of paying off a prior encumbrance, and where the person advancing the money expected to get good security therefore, the person advancing the money is not a volunteer, and, in the absence of intervening equities, he will be held to be subrogated to the lien which the money advanced is used to pay." *Katter v. Rodgers*, 1924 OK 674, 230 P. 500, 500–01; *Bourquin v. Feland*, 1941 OK 274, 117 P.2d 789, 791. Where an intervening lien exists, the case for application of equitable subrogation is not clear. *Equitable Life Assurance Soc. of U.S. v. McFadden*, 1937 OK 519, 72 P.2d 795, 797.

¶ 18 Indeed, in *Foster v. Whitenton*, 1923 OK 681, 221 P. 52, the Supreme Court held as much:

> [e]quity will reinstate a first mortgage lien in its original priority when the same has been released and a new mortgage taken on the property upon the mortgagor's misrepresentation that no intervening lien exists, and when the release is executed in ignorance of the existence of such intervening lien in the absence of laches or other facts rendering it inequitable to

subrogation is a creature of equity, not depending upon contract, but upon the equities of the parties. It is not dependent upon assignment, privity, or strict suretyship.").

grant the relief; but such relief will not be granted where an innocent junior incumberer would be placed in a worse position than he would have occupied had the senior incumberer not been released.[7]

■ ¶ 19 Negligence and improper business maneuvers by a lender might act to remove an equitable remedy entitling it to a priority lien. Those who "come into this court of equity with unclean hands ... should not be heard." *Tulsa Torpedo Co. v. Kennedy,* 1928 OK 383, 268 P. 205, 206.

■ ¶ 20 In the present case, Lender made an agreement with Borrowers to provide a refinance loan in return for the 2001 mortgage's priority position on the property. This is evidenced by the fact the loan was used to pay off all known encumbrances, and was for approximately the same amount. Also, Borrowers requested the loan for the purpose of refinancing at a lower interest rate and paying off the 2001 mortgage. Therefore, a trier of fact could find Lender did not voluntarily lend Borrowers money. Because Lender advanced the loan on a defective security for the purpose of paying off the 2001 mortgage, expecting to get good security, it is eligible for subrogation to the 2001 lien in the absence of intervening equities. *Bourquin v. Feland,* 1941 OK 274, 117 P.2d at 790.

■ ¶ 21 The presence of the intervening IRS lien requires this Court to review the record to determine whether, under the circumstances of this case, the trier of fact would find it would be inequitable to grant Lender summary adjudication on the issue of equitable subrogation.

¶ 22 IRS submits Lender's claim of exercising due diligence in searching for intervening liens is doubtful. At the outset, Lender conceded that it would not have granted the refinance had it discovered the intervening IRS lien. It is undisputed Borrowers misled Lender into believing it would receive the first mortgage's priority position upon pay off of the disclosed liens and lender loaned the money with the express intent it would receive a first priority mortgage as consideration. Moreover, the record indicates Lender obtained an initial title opinion two months before the loan and did not obtain actual notice of IRS's liens. IRS concedes this report did not notify Lender of the IRS's liens, without offering theories as to what happened.[8] Lender never ran a subsequent interim title search prior to funding. Also, although Lender claims to have exercised pre-loan diligence by generating a credit report on Borrowers, the record contains only Borrowers' signed release for this report in their loan application which is dated January 15, 2002, the same day they delivered the promissory note. Finally, IRS points out the affiant who affirmed the legitimacy of Lender's business practices prior to refinance is a person who was not a party to the transaction at issue and that Lender delayed recording its record title by twelve days after receipt of the note.

¶ 23 "[I]n order for a court to find that there is no substantial controversy as to any material fact raised by the issues, it must appear not only that there is no dispute as to such facts themselves, but also that reasonable people exercising fair and impartial judgment could not reach differing conclusions upon the undisputed facts." *Northrip v. Montgomery Ward and Co.,* 1974 OK 142, 529 P.2d 489, 493.

---

**7.** A large number of jurisdictions hold that one advancing money to discharge a prior lien on property, who takes a new mortgage as security, will be subrogated as against the holder of an intervening lien of which he was ignorant. Generally, this rule applies where the lender (1) was not a volunteer, (2) was not guilty of culpable negligence in failing to examine the records, or otherwise, (3) the junior or intervening lienor is not prejudiced, *i.e.* he will occupy the same position as though the prior lien had not been discharged, and (4) that the advance was made upon the expectation or understanding on the part of the lender that the new security which he took would be a first or prior lien on the property. R.E.H., Annotation, *Subrogation to Prior Lien of One Who Advances Money to Discharge it and Takes New Mortgage, as Against Intervening Lienor,* 70 A.L.R. 1396 (2005).

**8.** The meaning of a disclaimer on page two of the title opinion, "Limitations," is unclear. The portion states in fine print that "this opinion does not cover ... judgments, liens, pending litigation and other claims in Federal Court." However, IRS does not argue this clause has relevance.

¶ 24 The issue then is whether the record contains disputed material facts sufficient to support IRS's claim Lender committed an inexcusable mistake in failing to discover the existence of the intervening IRS lien. Lender has offered an affidavit by a third party in the industry stating that Lender obtained an initial title opinion, complicit with Lender's "policies and procedures." The affidavit seeks to support Lender's pre-loan diligence argument by claiming a credit report and interim title report were generated with respect to the loan. However, the record indicates neither was obtained prior to the loan. In *King v. Towe*, 2000 OK CIV APP 1, 996 P.2d 948, 949, this Court stated that due diligence was not exercised where a mortgagor failed to conduct an interim title report in the time between seeking the original abstract and the date of contract where the intervening lien existed in that interim period. Because IRS's lien was duly recorded, either of these acts may have supplemented whatever deficiencies existed in Lender's initial title report and given Lender notice of the intervening lien.[9] In light of *King*, this Court finds these facts to be evidence from which a trier of fact could find Lender failed to exercise due diligence.

¶ 25 Although IRS argues Oklahoma law facially weighs in its favor, it does not; however, the mere fact Lender is eligible for equitable subrogation is not a guarantee of entitlement. "[S]ummary adjudication deprives one party of a day in court .... [and] is not to be used as a device by the trial judge to expedite caseload reduction." *Sandusky v. Graham and Assoc., Inc.*, 1988 OK CIV APP 14, 766 P.2d 370, 371. This Court reverses the trial court's order granting equitable subrogation to Lender and remands for trial of fact issues regarding Lender's alleged exercise of due diligence in searching for intervening liens in relation to its loan and Lender's entitlement to equitable relief.

¶ 26 As to its second issue, IRS suggests the fact Borrowers were able to pocket residual cash from the loan (approximately 5%) should allow equity to weigh on IRS's side. The *Southwest Title* court appeared indifferent to the fact borrowers of a loan used to voluntarily pay off an encumbrance were able to pocket some residual cash after payment. Moreover, the *Bourquin* court stated a refinance loan which is *approximately* the same as the debt to be paid off is evidence of a valid substitute lien. *See Bourquin*, 1941 OK 274, 117 P.2d at 791. IRS fails to offer any authority which could lead this Court to reverse on the sole ground that a refinance loan generated a small percent of cash in excess of the debt it was issued to pay off. The trial court did not err on this second issue.

REVERSED and REMANDED.

BELL, P.J., and JOPLIN, J., concur.

---

9. *See also Citizens State Bank*, 1954 OK 51, 271 P.2d 725 (standing for the proposition that a lender who fails to exercise due diligence in discovering an intervening lien will be held to have constructive notice of that lien and therefore be denied equitable subrogation).