2014 OK CIV APP 78

## BANK OF AMERICA, N.A., successor by merger to Countrywide Bank, FSB, Plaintiff/Appellant,

### v.

## The UNKNOWN SUCCESSORS OF Sarah Jane LEWIS, Deceased, and Padgett Development Company, LLC, Defendants/Appellees.

### No. 111,634.

Court of Civil Appeals of Oklahoma, Division No. 2.

June 17, 2014.

---

Trent A. Gudgel, Angela L. Smoot, Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., Tulsa, Oklahoma, for Plaintiff/Appellant.

Luke Gaither, Luke Gaither, Attorney at Law, PLLC, Henryetta, Oklahoma, for Defendant/Appellee Padgett Development Company, LLC.

P. THOMAS THORNBRUGH, Judge.

¶ 1 Bank of America, N.A. (Bank), appeals the judgment of the district court that Bank's mortgage did not include a strip of land claimed by Padgett Development Company, LLC (PDC). Bank also appeals the court's fee award to PDC as a prevailing party in Bank's foreclosure action. We affirm the decisions of the district court.

## BACKGROUND

¶ 2 The relevant facts begin in July 1976, when non-parties Custer and Eulah Sandlin conveyed the following property by warranty deed ("Sandlin Deed") to Duane Woodliff and Richard Hutton:

All that part of the NW/4 in Section 10, Twp. 11N Range 12E, lying East of the center line of the County Road running North and South between the NW/4 and the NE/4 of said Section 10, Twp 11 N. Range 12E, containing six (6) acres more

or less [excepting minerals and rights of ingress and egress].

The deed is ambiguous, in that it transfers property in the NW/4 that lies *east* of a county road that runs *between* the NW/4 and the NE/4 of Section 10. However, if the county road runs *exactly between* the NW/4 and the NE/4 of Section 10, no part of the NW/4 can lie **east** of the county road.

¶ 3 A later deed again refers to a portion of the NW/4 that lies east of the county road. However, a September 1988 warranty deed from the Woodliffs to the Woodliffs as husband and wife elaborates that the road actually runs across the "East Half of the East Half of the East Half" of the NW/4, not exactly on the border between the two quarter-sections. No party has raised this issue, and all are in agreement that the property in question lies between the county road and the east edge of the NW/4.

¶ 4 In June 1981, Richard Hutton [1] conveyed his interest in this property to Duane Woodliff, and also conveyed a larger adjoining tract of 150 acres in the NE/4 of Section 10. We will refer to these two combined properties as the "Woodliff Property." The Woodliff Property was then transferred within the Woodliff family, first to Duane and Eloise Woodliff as joint tenants with right of survivorship, then to the "Duane A. Woodliff Revocable Trust." Duane Woodliff stated by affidavit that he had always believed that he owned the property down to the bottom of the NW/4 described in the Sandlin Deed; that the property was fenced as a single parcel before he obtained it, and he had continued this fencing; and that he was in exclusive possession of the property from

1976, and no other party had attempted to exercise control over it.

¶ 5 In 2007, PDC began negotiations to purchase the Woodliff Property. During the purchase process, PDC sought a title opinion, and the examiner noted that title to part of the property described in the Sandlin Deed was uncertain, in that one Sara Jane Lewis might also have an overlapping deed to the property described in the Sandlin Deed. Duane Woodliff contacted Lewis, who, on January 28, 2008, signed a quitclaim deed transferring the following property to PDC ("Lewis Quitclaim"):

> That part of the South Half of the Southeast Quarter of the Northwest Quarter (S/2 SE/4 NW/4) lying East of the Center of the County Road running North and South across said tract, in Section Ten (10), Township Eleven (11) North, Range Twelve (12) East of the Indian Meridian, Okmulgee County, State of Oklahoma

This deed transferred the southernmost portion of the strip of property in the NW/4 described in the Sandlin Deed. The same day, the Woodliff Revocable Trust transferred the Woodliff Property to PDC by warranty deed.

¶ 6 On January 30, 2008, however, Sara Jane Lewis also mortgaged the following property to Countrywide Bank FSB ("Countrywide Mortgage"):

> The S/2 of SE/4 of NW/4 of Section 10 Township 11 North Range 12 East of the Indian Meridian, Okmulgee County, State of Oklahoma

This situation is roughly depicted by the following diagram (not to scale):

---

1. The deed was also signed by Richard Hutton's wife, Gail Hutton.

NW ¼ S 10 County Road NE ¼ S 10

Woodliff Property

Disputed Area

Lewis

¶ 7 The record reflects that Lewis transferred the part of the S/2 SE/4 NW/4 that lay east of the county road to PDC on January 28, 2008, but also mortgaged S/2 SE/4 NW/4 in its entirety to Countrywide Bank on January 30, 2008. This mortgage is the source of the current dispute.

¶ 8 Sara Jane Lewis evidently died in February 2009, and no payments were made on the mortgage after March 2009. In October 2009, Bank, as successor to Countrywide, sued to foreclose on the Countrywide Mortgage. In January 2010, Bank filed an amended petition naming PDC as a party and requesting foreclosure against any interest of PDC. PDC answered and counterclaimed that it owned the part of S/2 SE/4 NW/4 east of the road, both by virtue of the Lewis Quitclaim and by virtue of Duane Woodliff's adverse possession of the disputed property under color of title since 1976.

¶ 9 Both parties filed motions for summary judgment. The court granted judgment to PDC. After the district court rendered judgment in its favor, PDC filed an application for attorney fees. The application stated the *Burk* factors and included an affidavit of time spent on the matter. It did not identify a statutory basis for fees. Bank replied, arguing that PDC had failed to cite a statute allowing fees in this matter. The district court ruled on April 3, 2013, that PDC was entitled to fees, and the amount of fees for hearing on May 8, 2013. The next record order notes that, on May 8, PDC appeared

through counsel, but Bank did not appear. The order notes that Bank had "agreed to fees in the amount of $3,923.75." Bank appeals both the court's grant of summary judgment and its award of fees. This court held oral argument on the fee issue on March 4, 2014.

## STANDARD OF REVIEW

¶ 10 "Summary judgment is proper only when it appears that there is no substantial controversy as to any material fact and that one of the parties is entitled to judgment as a matter of law." *Jordan v. Jordan*, 2006 OK 88, ¶ 17, 151 P.3d 117. We review a grant of summary judgment *de novo*. *Young v. Macy*, 2001 OK 4, ¶ 9, 21 P.3d 44. On appeal of the legal basis of a fee award, this Court assumes "plenary, independent and non-deferential authority to reexamine the trial court's legal rulings." *Mitzner v. Poage*, 2009 OK CIV APP 100, ¶ 7, 229 P.3d 1270.

## ANALYSIS

### I. BANK'S EQUITABLE SUBROGATION CLAIM

¶ 11 Bank argued that it retains an interest in the property quitclaimed by Lewis pursuant to the principle of equitable subrogation because there was a mortgage on the property prior to the Countrywide Mortgage, and the property transferred by the Lewis

Quitclaim was subject to that prior mortgage interest. Bank then argued that Countrywide had paid off this previous mortgage as part of the new mortgage, and Bank as successor, became subrogated into the position of the previous mortgagee. Therefore, Bank argued, the quitclaimed property was subject to the Countrywide Mortgage, even though it was not made until after the quitclaim was signed.

¶ 12 The general principles regarding equitable subrogation of liens are stated in *Mortgage Electronic Registration Systems, Inc. v. U.S. ex rel. Internal Revenue Service*, 2006 OK CIV APP 45, ¶ 15, 134 P.3d 913. A lender who:

> [V]oluntarily loans money to mortgagor for the purpose of satisfying and canceling a prior mortgage, taking a new mortgage for his own security, cannot have the former mortgage revived and himself subrogated to the rights of the mortgagee thereon when he has failed to take an assignment of the prior mortgage, and has voluntarily paid and discharged the same record.

*Id.* (footnote omitted) (quoting *Southwest Title & Trust Co. v. Norman Lumber Co.*, 1968 OK 71, 441 P.2d 430, and citing *Citizens State Bank of Tulsa v. Pittsburg Cty. Broad. Co.*, 1954 OK 51, 271 P.2d 725). The sole evidence produced to show that Bank loaned money to Lewis to pay off the previous mortgage was a HUD "settlement statement" showing the amount already paid on the previous loan, and the amount required to pay off the loan. The document does not show that Bank "took an assignment of the loan" as required by *Mortgage Electronic Registration Systems.*

¶ 13 *Mortgage Electronic Registration Systems* also notes a second principle. At 118 of that opinion, quoting *Foster v. Whitenton*, 1923 OK 681, 96 Okla. 187, 221 P. 52, the Court states:

> [E]quity will reinstate a first mortgage lien in its original priority when the same has been released and a new mortgage taken on the property upon the mortgagor's misrepresentation that no intervening lien ex-

ists, and when the release is executed in ignorance of the existence of such intervening lien. . . .

The mortgage agreement signed by Lewis covenants that she was "lawfully seized of the estate hereby conveyed," but makes no representation involving an "intervening lien."

¶ 14 Bank further relied on the rule of *Equitable Life Assurance Society v. McFadden*, 1937 OK 519, ¶ 0, 181 Okla. 162, 72 P.2d 795 (court syllabus), that an innocent taker of a "forged real estate mortgage" gains some subrogation rights. In the *McFadden* case, Sterling McFadden forged the signature of his wife, Louettie McFadden, on a mortgage, and the Court later assessed the rights of Louettie McFadden against the mortgagee and other lienholders. This is not the case before us. No forged instrument is involved, and Bank did not rely on a forged instrument.[2] We find no evidence indicating that Bank had any subrogation right against PDC via the Lewis Quitclaim. Further, as we discuss later, PDC did not obtain title to the disputed strip via the Lewis Quitclaim, but either by adverse possession that had previously ripened, or by a 1976 warranty deed.

## II. ADVERSE POSSESSION

### A. The Issues in the Case

¶ 15 The issue of the Lewis Quitclaim is tightly linked to another issue. We must emphasize the importance of the diagram of the competing interests, because it confirms that, in 1976, Duane Woodliff and Richard Hutton received a *warranty deed that included the disputed tract.* The 1976 Sandlin Deed transferred the entire strip of the NW/4 between the county road and the western edge of the NE/4 to Woodliff and Hutton. The chain of title is then continuous to the warranty deed from the Woodliff Revocable Trust to PDC, which includes the same property. The record shows that there was a recorded claim of title to the disputed property by Woodliff and also by Lewis.[3]

---

2. The record shows that Bank apparently relied on a title opinion that failed to detect that the

Sandlin Deed transferred property that also fell within the description of the Lewis property.

3. No actual deed was produced showing that

The Lewis Quitclaim has effect only if Lewis had some interest in the property to transfer. If Duane Woodliff gained title by adverse possession before the sale to PDC, the Lewis Quitclaim to PDC is of no importance beyond correcting the title records, and PDC obtained title through Woodliff's occupation and transfer, not through the Lewis Quitclaim.

### B. Adverse Possession by Woodliff

¶ 16 The Sandlin Deed transfered the strip of the NW/4 that lies between the county road and the edge of the NE/4. Woodliff, therefore, had a claim of title to all of this property, and occupied it under that claim. "Adverse possession of real estate for the period of time prescribed by the statute ripens into title by prescription, and such adverse possession may be either under claim of right or color of title." *Choate v. Muskogee Elec. Traction Co.*, 1956 OK 107, ¶ 0, 295 P.2d 781 (court syllabus). Title 60 O.S.2011 § 333 states that:

> Occupancy for the period prescribed by civil procedure, or any law of this state as sufficient to bar an action for the recovery of the property, **confers a title thereto,** denominated a title by prescription, which is sufficient against all. (Emphasis added.)

Title 12 O.S.2011 § 93, limits an action for the recovery of real property to 15 years.

¶ 17 To acquire possession by prescription, the possession "must be open, visible, continuous, and exclusive, with a claim of ownership, such as will notify parties seeking information upon the subject that the premises are not held in subordination to any title or claims of others, but against all titles and claimants." *Loris v. Patrick*, 1966 OK 79, ¶ 7, 414 P.2d 249. Furthermore, the possession must also be actual, notorious, and hostile. *Id.* at ¶ 9. "If the owner acquiesces in or consents to the use of the land, then the use is not adverse and title by prescription cannot be acquired." *Willis v. Holley*, 1996 OK 107, ¶ 6, 925 P.2d 539.

¶ 18 Duane Woodliff stated by affidavit that:

1. He had been the record owner of the disputed property since 1976.

2. He understood that the disputed property was his at the time of purchase, and he had no notice of any claim to the property until 2007

3 He had fenced the property, and it also had been fenced by prior owners.

4. Neither Lewis nor any predecessor in interest had used the property or attempted to enter upon it.

¶ 19 Bank responded with several arguments which we will analyze in turn. We first note that, Bank argued from the position that PDC was required to show that *PDC was in adverse possession of the property.* This is not legally correct. If possession under color of title ripened into prescriptive title pursuant to 60 O.S.2011 § 333, it did so before PDC obtained the property. Bank's summary judgment arguments address whether *PDC* performed the various acts required for adverse possession. The issue was, in fact, whether *Woodliff's* actions met the requirements of adverse possession, and thus ripened into title which he transferred to PDC. We must properly analyze Bank's arguments as being directed toward Woodliff's acts between 1976 and 2008, not PDC's acts after 2008.

### C. "Proof of Fencing"

¶ 20 Bank's first argument was that there was no "proof" of the existence of the fence that Duane Woodliff identified in his affidavit. In doing so, Bank mistakes the summary judgment standard. Woodliff stated by affidavit that the disputed property was fenced when he purchased it in 1976, and that he had also fenced it. Pursuant to the burden shift noted in *Reeds v. Walker*, 2006 OK 43, ¶ 32, 157 P.3d 100, Bank was then

---

Lewis was a record owner of the disputed property, and no prior mortgage was produced. However, Bank did produce a "Title Opinion" by Stewart Title indicating that Lewis had an ownership interest, and PDC stated that its title search had also found such an interest. Bank also produced a page from a website containing county assessor information indicating that Lewis may also have record title to the same tract. For the purposes of summary judgment, we presume that both Woodliff and Lewis could show recorded instruments indicating title to the disputed property.

required to bring evidence such that a jury could find there was no fence. A denial by counsel of the opposing affidavit is not probative evidence, and, in the absence of any other facts or an obvious lack of credibility, does not suffice to call Woodliff's affidavit into question. Woodliff stated by affidavit that there was a fence, and Bank brought no evidence indicating a question of fact as to his statement

¶ 21 Bank also argues that Woodliff's statements that he fenced his property are insufficient to establish that the fence actually enclosed the disputed area. Bank strains to find ambiguity where there was none. Woodliff stated that he owned the disputed area as his property, and that he fenced *his property*.[4] We find no evidence disputing this statement.

### D. Color of Title

██ ¶ 22 Bank also argued that there had been no occupation under color of title. This claim is contrary to the Sandlin Deed, which transfers all property in the NW/4 east of the county road. This includes the disputed property. The Sandlin Deed provides the claim of title required for adverse possession under color of title.

### E. Actual Possession

██ ¶ 23 Bank argued that Woodliff has shown no act of "actual possession" of the disputed property. "What constitutes adverse possession depends on the circumstances of the particular case, as measured by the judgment of reasonable people." *Akin v. Castleberry*, 2012 OK 79, ¶ 13, 286 P.3d 638. "The determination in any given case must largely depend on the situation of the parties, size and extent of land, and purpose for which it is adapted." *Id.* "It is not necessary, in order to establish and maintain possession of real estate ... that the claimant should actually reside upon it or have it enclosed with a fence. It is sufficient if the party is doing such acts thereon that indicate in an open, public and visible manner that he has the exclusive control over the

land under claim of right to such exclusive possession." *Farris v. Smallwood*, 1951 OK 25, ¶ 0, 204 Okla. 123, 227 P.2d 644 (court syllabus). We find that Woodliff demonstrated the element of "actual possession."

### F. "Open and Notorious" Possession

¶ 24 Bank further argued that Woodliff did not show his possession to be "open and notorious." Bank admitted in its briefing that "fencing" can satisfy this requirement. Bank's argument is essentially a repetition of its argument that the evidence presented on summary judgment did not conclusively establish that the property was fenced. We have addressed this argument in Section II C of this opinion.

### G. The Period of Possession

██ ¶ 25 Bank's next theory was that Woodliff's possession of the property was not shown to be continuous for the 15–year statutory period. The record shows an unbroken chain of title from the 1976 Sandlin Deed to the sale of the property in 2008. However, Bank argued that Sara Jane Lewis mortgaged the property at some time between 1976 and 2008, and this mortgage "interrupted" Woodliff's possession.

¶ 26 Bank stated that, pursuant to *Flagg v. Faudree*, 2012 OK CIV APP 4, ¶ 14, 269 P.3d 45. the making or recording of the mortgage represented an "unequivocal act of ownership" by Lewis that interrupted Woodliff's possession. Bank's interpretation of *Flagg* is entirely without merit. The cited paragraph from *Flagg* clearly states that "adverse possession is not interrupted by giving notice to an occupant that true title is in someone else unless the landowner, or someone in his behalf, acts overtly to oust the adverse claimant." *Id.* (internal quotation marks omitted). The undisputed evidence was that there was no attempt by another to enter or use the property during this period, or to oust Woodliff from possession. We find no evidence of interruption of Woodliff's claimed period of possession.

---

**4.** The record gives no indication why, if such a crucial question of fact existed, it could not be conclusively answered by the simple expedient of someone actually visiting the property on Bank's behalf and observing the fence.

## H. Property Taxes

¶ 27 Bank argued that Woodliff's "failure to produce evidence that he paid property taxes" weakens his claim of adverse possession, citing *Norman v. Smedley*, 1961 OK 143, 363 P.2d 839, as authority. *Norman* states, "Evidence that the adverse claimant *did not* pay the taxes on the land in dispute or that some other person paid them is admissible as tending to show that the possession was not hostile." *Id.* at 120 (emphasis added) (quotation marks omitted). In this case, there was neither evidence that Woodliff paid the taxes, nor evidence that he did not. The record is silent on the question.

¶ 28 Bank extrapolates from the rule of *Norman* that if no evidence is produced on the payment of taxes, this creates a presumption that they were not paid. We do not so interpret *Norman*. Bank did not claim that Sara Jane Lewis paid the taxes, but did submit as part of its summary judgment motion a 2007 print-out from the "County Asssseor.Info" website showing the property on which Lewis was assessed property tax. This printout does not show that Lewis paid taxes on the entire tract claimed by Bank. The county assessor believed the Lewis property to be the "S/2 SE NW **Less 30′ & SE SW NW**" (emphasis added), i.e., that Lewis did not own the entire S/2 of the SE/4 of the NW/4, and that her property also extended into the SE/4 of the SW/4 of the NW/4. It shows that the county assessor did *not* regard Lewis's property as covering the entire S/2 of the SE/4 of the NW/4 as claimed by Bank. The owner of the 30 feet of land excluded from the Lewis property description is not shown by the record. We find no evidence on the tax issue.[5]

## I. Tacking

¶ 29 Bank finally argued that no individual owner had possessed the property for the required 15–year period, and that PDC had failed to bring evidence that each individual owner had performed all the acts required to establish adverse possession and thus "tack" the possession for the required statutory period. Bank's argument appears based on its theory that adverse possession does not ripen until a court declares it to have occurred (and thus PDC was required to show that *it* had performed acts of adverse possession after it purchased the property in order to "tack" to Woodliff's ownership.) As previously noted, "Adverse possession of real estate for the period of time prescribed by the statute ripens into title by prescription," *Choate*, 1956 OK 107 at ¶ 0, and 60, 295 P.2d 781 O.S.2011 § 333 states:

> Occupancy for the period prescribed by civil procedure, or any law of this state as sufficient to bar an action for the recovery of the property, **confers a title thereto,** denominated a title by prescription, which is sufficient against all. (Emphasis added.)

Therefore, if Woodliff's possession ripened into prescriptive title before the transfer by warranty deed to PDC, PDC does not need to show that it performed acts of adverse possession.

¶ 30 The record was clear that Woodliff obtained exclusive title to the property as early as 1981, and was a co-owner from 1976. In 1988 the property was transferred from "Duane A. Woodliff, joined by his spouse, F. Eloise Woodliff" to "Duane A. Woodliff and F. Eloise Woodliff, husband and wife"; and in 1997 it was transferred to the "Duane A. Woodliff Revocable Trust." In 2008, it was transferred to PDC. Bank argues that each of these transfers created new owners of the property, each of whom had to re-establish the elements of adverse possession.

¶ 31 We note that the Woodliff Trust was revocable, and that Duane and Eloise Woodliff were the trustees. Thus, the control of the property was vested in Duane and Eloise Woodliff between 1988 and 2008, a period of 20 years. Therefore, the affidavit of Duane Woodliff regarding the occupation and fencing of the property, under a chain of title dating back to 1976, and the lack of challenge or attempted entry by others, covers the entire time Woodliff was in control of the

---

**5.** Given that both Lewis and Woodliff apparently had recorded claims of title that might cover the disputed property, it is equally possible that *both* may have paid taxes on it—a most unsatisfactory situation!

property, which was at least between 1988 and 2008.

¶ 32 "Where privity exists between successive occupants under color of title, successive periods of occupation may be united to each other to make up [the] period required to obtain title by adverse possession." *Smith v. Pettijohn*, 1961 OK 246, ¶ 0, 366 P.2d 633 (court syllabus). We find no gap in the evidence of adverse possession presented by Woodliff.

### J. Conclusion–Adverse Possession

¶ 33 We find that the evidence of adverse possession presented by PDC was sufficient to establish the elements of the claim, if undisputed. It was then Bank's burden to show some dispute of fact as to these elements. It failed to do so. We therefore affirm the summary judgment of the district court.

### III. ATTORNEY FEES

¶ 34 The district court's fee award did not state a basis, but the evident basis was that PDC had prevailed in a foreclosure action pursuant to *12 O.S.2011 § 686*. This Court held oral argument on this issue on March 4, 2014, and we will address issues raised in that argument as part of this opinion.

### A. Was There an Agreement on Fees?

¶ 35 We must first address the trial court's fee order. The order states that Bank had "agree[d] to attorney fees in the amount of $3,923.75." If this is merely a statement that the parties stipulated as to the reasonableness of PDC's fee amount, it is of little importance in the current debate. If it indicates a private agreement between the parties to pay fees, the fee question is out of our hands. Reviewing the record, we interpret the court's order as one awarding fees pursuant to the Oklahoma statutes, rather than a confirmation or enforcement of a private settlement of the issue. Therefore, the fee issue is properly before us.

### B. Does § 686 Allow Fees to Successful Defendants as Well as Plaintiffs?

¶ 36 Title 12 O.S.2011 § 686 provides that, in *actions to enforce a mortgage*, a personal judgment shall be rendered for the amount or amounts due and the court shall tax the "costs, attorney's fees and expenses which may accrue in the action." Although § 686 "appears to speak only to the party bringing the action, or other parties to the action having liens on the premises involved," Oklahoma courts have held that this statute is broad enough to be applied to the "prevailing party." *Federal Nat. Bank and Trust Co. of Shawnee v. Ryan*, 1978 OK CIV APP 51, ¶ 8, 588 P.2d 592 (citing *Mid–State Homes, Inc. v. Johnston*, 1976 OK 20, 547 P.2d 1302). The parties were in accord at oral argument. We concur with the view that parties who prevail on a foreclosure claim or prevail against a foreclosure claim are entitled to seek fees pursuant to § 686.

¶ 37 This view is consistent with Oklahoma's treatment of cases involving notes: a party that successfully enforces a note is entitled to a fee; a party that successfully defends against an enforcement suit is entitled to a fee (12 O.S.2011 § 936); but a party that files suit seeking to cancel a note does not institute or prevail in an enforcement proceeding. *Borst v. Bright Mortgage Co.*, 1991 OK 121, 824 P.2d 1102.

### C. Has the District Court Rendered a Foreclosure Decision?

¶ 38 Bank argues that the district court's judgment of March 5, 2013, did not deny its foreclosure claim against PDC; hence, no fee is available to PDC as a prevailing party in a foreclosure action. The court's judgment of March 5, 2013, states a finding that Bank has "no right, title, lien, estate, encumbrance, claim, assessment or interest, either in law or in equity, in and to the disputed tract or any part thereof." We find this to be an unequivocal holding that Bank cannot foreclose upon the disputed strip of property, and properly constitutes a final decision on Bank's foreclosure suit as it applied to PDC.

### D. Are Fees Pursuant § 686 Limited to Parties to the Note?

¶ 39 Bank argues that the fee provision of § 686 does not extend to parties sued for foreclosure on an *in rem* basis, i.e., parties that hold an interest in the property but are otherwise strangers to the litigation because they are not parties to the underlying note, mortgage, or lien. Examining § 686, we find no apparent basis as to why a mortgagor would be entitled to fees for successfully defending its interest against a foreclosure action, but an outright owner would not. Both are required to appear and defend against the foreclosure claim or lose their property. Both receive a judgment that foreclosure was not justified by law. Both experience the same inconvenience and expense in resisting the unjustified foreclosure. Thus, Bank's position is justified only if fees pursuant to § 686 are distinctly awarded only for defending against enforcement of the note or enforcement of the lien created by the mortgage, rather than for defending against the foreclosure and sale of the property.

¶ 40 We note that another division of this Court held, in *Marcha v. Austin,* 1983 OK CIV APP 71, ¶ 9, 674 P.2d 1156, that "Title 12 O.S.1981 § 686, provides for costs and attorney's fees to lienholders who successfully enforce or defend their interests in a foreclosure action," apparently pursuant to the fees provided by 42 O.S.2011 § 176. Further, Oklahoma has a fee statute regarding recovery on a note. Title 12 O.S.2011 § 936, provides that in any civil action to recover on a note, the prevailing party shall be allowed a reasonable attorney fee.

¶ 41 Given the existence of 42 O.S.2011 § 176 and 12 O.S.2011 § 936, § 686 must have some purpose beyond repeating the fee entitlements of these two statutes—*its scope must go beyond fees for the enforcement of notes or liens, and encompass other aspects of foreclosure.* The clear answer is that it also encompasses the *in rem* defendants who have no relationship to the note or mortgage lien, but whose property is alleged to be subject to the foreclosure.

¶ 42 We find that § 686 is not limited in the way Bank suggests, and that it allows an award of fees to property owners who are otherwise strangers to the mortgage and who prevail after a party attempts to foreclose on their property.

### E. Did PDC Prevail in a Foreclosure, or a Quiet Title Claim?

¶ 43 Bank's final argument is that PDC did not prevail in a foreclosure action because it defeated foreclosure by a "counterclaim" to quiet title. Bank argues that fees are only available in a "quiet title" action if the pre-suit notice provisions of the Nonjudicial Marketable Title Procedures Act (MTPA), 12 O.S.2011 § 1141.4, are followed.

¶ 44 As a side note, the purpose of the notice provisions of the MTPA is to allow a potential defendant an opportunity to voluntarily correct a title problem and thereby avoid the expense of answering a suit and incurring fees. The Act seeks to encourage settlement pre-suit when the potential defendant does not wish to contest ownership. This process is *clearly futile* when a quiet title claim is raised in response to a foreclosure action. A foreclosing party who sues a stranger to the note and mortgage is already aware of the ownership controversy, *and has already decided that it will not relinquish the disputed property, but instead will claim ownership of it.* No purpose of the MTPA is achieved by giving such a party an opportunity to relinquish its claim "pre-suit."

¶ 45 Further, we do not agree with the inherent argument that the MTPA provides the exclusive procedure by which a party in PDC's position may defend against a foreclosure claim, or that the Act modified § 686 to deny fees to a party in PDC's position unless foreclosure was opposed by a quiet title action and the notice procedures of the Act followed.

¶ 46 The common law "remains in full force unless some legislative enactment explicitly provides otherwise." *Watson v. Gibson Capital, L.L.C.,* 2008 OK 56, ¶ 12, 187 P.3d 735. PDC could prevail in the foreclosure case without requesting that the court

quiet title.[6] We view the court's decision as one both denying foreclosure to Bank, and quieting title in PDC.

 ¶ 47 The question is, therefore, how the result of this case should be characterized for fee purposes. PDC prevailed against Bank's foreclosure suit and prevailed in its quiet title action. As PDC obtained both fee-bearing and non-fee-bearing relief, the relevant question could be one of apportionment pursuant to *Green Bay Packaging, Inc. v. Preferred Packaging, Inc.*, 1996 OK 121, 932 P.2d 1091. However, in this case the question of title and the question of the right to foreclose appear so "inextricably intertwined" that the fees could not be segregated.

¶ 48 We find that PDC prevailed on both a foreclosure action and on its counterclaim to quiet title. We find that the work required defeating the foreclosure by a claim of title was substantially identical to that required to quiet title, and could not be segregated for apportionment pursuant to *Green Bay Packaging, Inc.* Therefore we affirm the district court's award of fees to PDC in this matter.

## CONCLUSION

¶ 49 We find no error in the district court's grant of summary judgment to PDC, or in its subsequent fee award pursuant to the applicable standards of review. We therefore affirm its decisions.

¶ 50 **AFFIRMED.**

FISCHER, P.J., and RAPP, J., concur.

6. Bank's argument further raises the anomaly that PDC might be entitled to fees if it had stated its claim of ownership as an "affirmative defense to foreclosure," but not entitled to fees if it raised the same claim of ownership as a "counterclaim."